FRANNY A. FORSMAN
Federal Public Defender
Nevada State Bar No. 00014
PAUL D. RIDDLE
411 E. Bonneville Ave., Suite 250
Las Vegas, Nevada 89101
Tel: (702) 388-6577
Fax: (702) 388-6261

Attorney for Defendant: **ROGER VON BERGENDORFF**

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>vs.<br><br>ROGER VON BERGENDORFF ,<br><br>              Defendant. | Case No.: 2:08-CR-111-RCJ-(RJJ)<br><br>**DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM** |

**CERTIFICATION:** This memorandum is timely filed.

   COMES NOW the defendant, ROGER VON BERGENDORFF, by and through his counsel of record, Paul D. Riddle, Assistant Federal Public Defender, and hereby submits this Sentencing Memorandum in connection with his sentencing presently scheduled for Wednesday, November 12, 2008 at 10:00 AM.

   DATED this 5th day of November, 2008.

                                         FRANNY A. FORSMAN
                                         Federal Public Defender


                                         By: /s/ Paul D. Riddle
                                             PAUL D. RIDDLE
                                             Assistant Federal Public Defender

1

# I.

## **POINTS AND AUTHORITIES**

Roger Von Bergendorff (hereinafter "Roger" or "Mr. Bergendorff") was indicted on April 22, 2008, in a three count Criminal Indictment. <u>See</u> United States Probation Pre-Sentence Report ("PSR") at ¶ 1. On August 4, 2008, Mr. Bergendorff entered into a plea agreement with the United States Government in which he agreed to plead guilty to counts one and two of the Criminal Indictment and the Government agreed to recommend a sentence at the low end of the sentencing guideline range. Mr. Bergendorff pleaded guilty to Possession of a Biological Toxin, in violation of 18 U.S.C. § 175(b) and Possession of Unregistered Firearms, in violation of 26 U.S.C. 5861(d). Sentencing has been scheduled for Wednesday, November 12, 2008 at 10:00 a.m. before this Honorable Court.

The Presentence Investigation Report was timely disclosed by the probation officer to counsel for the parties. Probation has calculated Mr. Bergendorff's total offense level at 21. <u>Id.</u> at ¶ 50. The base offense level for Possession of Biological Toxin is level 20, pursuant to United States Sentencing Guidelines (U.S.S.G.) 2M6.1(a)(4)(A). <u>Id.</u> at ¶ 14. Probation recommends that the base offense level be increased by two levels pursuant to U.S.S.G. § 2M6.1(b)(1)(A) and (B)(I) because the offense involved a select biological agent (Ricin). <u>Id.</u> at ¶ 31. The base offense level for Possession of Unregistered Firearms is 18 pursuant to U.S.S.G. 2K2.1(a)(5). <u>Id</u> at ¶ 37. Under U.S.S.G. 3D1.4 allowing for adjustments for multiple counts, the Combined Adjusted Offense Level in this case is 24. <u>Id.</u> at ¶ 48. Probation further recommends a 3-level reduction to the offense level pursuant to U.S.S.G. §3E1.1 for timely acceptance of responsibility. <u>Id.</u> at ¶ 49. This results in an adjusted offense level of 21. <u>Id.</u> at ¶ 50.

Probation's computation of Mr. Bergendorff's criminal history places him in Criminal History Category I with absolutely no criminal history points. Id. at ¶ 53. According to the Sentencing Guidelines, the appropriate guideline sentencing range in the instant matter is 37 to 46 months. Id. at ¶ 93. Probation has recommended a term at the high-end of the advisory range, a sentence of 46 months. Id. at ¶ 108.

Mr. Bergendorff does not dispute the calculation of the guidelines. However, he does argue that Probation has perhaps not fully taken into account all of the factors under 18 U.S.C. § 3553(a) when determining their recommendation of the appropriate sentence in the instant matter. Mr. Bergendorff submits that a sentence at the low-end of the applicable guideline range, a sentence of 37 months as contemplated by the parties, will be sufficient to comply with all of the sentencing factors enumerated in 18 U.S.C. § 3553(a).

## II.

**THIS COURT SHOULD IMPOSE A SENTENCE AT THE LOW-END OF THE ADVISORY GUIDELINE RANGE IN ORDER TO COMPLY WITH THE MANDATE THAT MR. BERGENDORFF'S SENTENCE BE "SUFFICIENT, BUT NOT GREATER THAN NECESSARY"**

The sentencing mandate from Section 3553(a) limits the type of sentence a court may impose. The overriding principle and basic mandate of Section 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in Section 3553(a).[1]  Thus, the primary sentencing mandate of Section 3553(a) states that

---

[1] The purposes set forth in Section 3553(a)(2) are:

A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
B)     to afford adequate deterrence to criminal conduct;
C)     to protect the public from further crimes of the defendant; and
D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional

3

courts must impose the minimally sufficient sentence to achieve the statutory purposes of punishment, deterrence, incapacitation, and rehabilitation.

Under <u>United States v. Booker</u>, 543 U.S. 220 (2005), district courts must now impose a sentence that takes into account the applicable Guideline calculations along with the sentencing goals described in 18 U.S.C. § 3553(a). In fact, the directives of <u>Booker</u> make it clear that courts may no longer uncritically apply the Sentencing Guidelines without contemporaneously resorting to the other factors detailed under 18 U.S.C. § 3553(a). The Ninth Circuit's interpretation of <u>Booker</u> requires that the district court consider all of the factors enumerated in §3553. See <u>United States v. Diaz-Argueta</u>, 447 F.3D 1167, 1171 (9th Cir. 2006). This, of course, does not mean that the Court must review each factor independently like a laundry list, but rather that the Court consider each of the factors as playing a role in the determination of the appropriate sentence. See <u>United States v. Knows His Gun</u>, 438 F.3d 913, 918 (9th Cir. 2006).

In the instant matter, the Probation Officer calculated Mr. Bergendorff's advisory guideline range, or the starting point for sentencing purposes, at 37 to 46 months, and has recommended a sentence at the high-end of this range, 46 months. There are factors, however, which warrant a sentence at the low-end of the advisory guideline range as contemplated by the parties.

**A.    Mr. Bergendorff's Social History**

Mr. Bergendorff has pleaded guilty to one count of Possession of Biological Toxin and one count of Possession of Unregistered Firearms. Before the court is a man with no criminal history and a private life full of both success and personal tragedy. Mr. Bergendorff is very remorseful for the situation he finds himself in and for the embarrassment and dispersions this has brought on his

---

treatment in the most effective manner.

family. Mr. Bergendorff regrets that he has taken up the time and resources of law enforcement and the court system. He has been completely and totally cooperative with law enforcement and especially with the Federal Bureau of Investigation. Mostly, Mr. Bergendorff is regretful that he may have caused fear among the citizens of Las Vegas because of his actions in the current case. Mr. Bergendorff is truly sorry for the course of events that have required his presence before the court and understands that a period of incarceration is necessary in order to reflect the seriousness of his offense and provide for just punishment. Mr. Bergendorff asks however, that when imposing sentence in his case, this Court also consider his personal history, his lack of prior criminal conduct, and the fact that any sentence of incarceration will deter him from future criminal activity.

Roger Von Bergendorff was born December 25, 1950 to Fred Raymond and Lola Marie Bergendorff. Roger was the middle of three brothers. The oldest Bergendorff brother was named Fred Lavoy Bergendorff and the youngest brother was named Eric Linning Bergendorff. The Bergendorffs moved several times as a young family from Idaho to Utah and eventually settled in California.

The Bergendorffs were a supportive and close knit family. Roger recalls that the family spent a lot of time together going to parks, playing sports, and driving to various vacation spots around the country. Roger has many fond memories of trips to Disneyland and other yearly sightseeing trips around the country.

The Bergendorffs were also a very religious family. Roger was raised in a Christian household where the church was an integral part of their family. As a family, the Bergendorffs attended church services on a weekly basis and were committed to their faith.

As a young man, Roger showed an interest and a talent for anything artistic. Like his father

before him, Roger liked to draw and paint and express himself in an creative way. Roger received a Bachelor's Degree in Fine Arts in Illustration from the Art Center of Design in Pasadena, California on May 23, 1980. Roger received this degree with distinction and has proven himself to be a very talented artist. Roger has held down jobs in illustration and design with a speciality in magazine illustration and book design. Most recently, Roger worked designing video game graphics and also worked with multiple gaming companies designing graphics for slot machines.

Roger admits that he experimented with drugs and alcohol as a young man in the 1960s and 1970s. While illegal drugs were never a problem for Roger, he did struggle with addiction to alcohol early in his adult life. In 1986, Roger reached his bottom with drinking. He sought professional help from a physician he thought would help him with his addiction. Instead of getting the medical help he sought however, Roger was prescribed a variety of medications including sleeping pills, tranquilizers and pain killers. This physician prescribed Roger eleven different drugs in all. Roger managed to quit drinking at this time; however, three years later, after having taken massive doses of prescribed medication, Roger hit a far worse bottom than he had previously. Roger made a life changing decision to take matters into his own hands and, on October 8, 1989, he attended his first Alcoholics Anonymous meeting. Roger decided to quit taking every one of the eleven medications prescribed by his physician.

While Roger was committed to his sobriety, the first few years were difficult to say the least. Immediately after Roger quit the drugs and alcohol, he was in the best shape of his life both physically and mentally. He had a career, a house in Huntington Beach, a nice car and a girlfriend. Unfortunately, this blissful feeling did not last long. On the surface, Roger appeared to be on top of the world. In fact, Roger was not on top of the world.

It took Roger approximately six years to fully rid his body of all the prescribed medication he had been taking. Quitting the massive doses of medication was very difficult but Roger chose not to seek any medical treatment because he no longer trusted the medical profession. Roger describes his nervous system at the time was like an "electrical fire." He was a physical and emotional wreck. Roger feels it was a miracle that he was able to accomplish anything during that time. Every single thing he attempted to do was a test of his resolve to maintain his sobriety and no longer use the prescribed medication or alcohol. For several years, Roger got through every minute of every hour of every day one step at a time. Eventually, Roger succumbed to his depression and anxiety and was unable to work. He lost his business and, economically, he was ruined because of his health problems. His car was eventually repossessed and he was practically destitute. He lost his house and was forced to move into a storage room in his parents' backyard where he lived for the next eight years.

Roger chose to seek comfort and solace within his AA program and managed to overcome every challenge. Given every obstacle Roger faced after that first meeting in October, 1989, it is nothing short of amazing that Roger was able to maintain his resolve not to drink or abuse drugs. Roger is very proud that he has been clean and sober for the past 19 years.

In approximately 1980, Roger's father was diagnosed with Alzheimer's Disease. Fred Sr. was approximately 60 years old at the time. This diagnosis hit the family very hard; especially Roger. Roger recalls very fondly the family vacations and weekends playing baseball and football with his brothers and his father. Fred Sr. was the rock and the strength of the family and this diagnosis was tragic. Over the next few years, Roger watched his father's condition deteriorate to the point that his father could no longer care for himself and had to be placed into a nursing care facility. This was extremely difficult for Roger to watch and the fact that his own father could no

longer recognize him was devastating.  Fred Raymond Bergendorff eventually succumbed to the disease in 1991 at the age of 71.

Shortly after his father's death, Roger lost a cousin who was like a sister to him.  He also lost his two favorite and very cherished pets.  To add insult to injury, Roger began to experience some medical problems of his own.  Finally, Roger had a heart attack at the age of 47.  Physicians told Roger that there did not appear to be any physical reason for the heart attack and told him that the heart attack was most likely brought on by stress.

Once his father passed away, Roger and his brothers were left to care for and support their mother.  Roger and his brothers continued to care for their mother until, tragically, she passed away a few years later from a heart attack at the age of 78.  The struggle to stay sober, the pains of withdrawal from prescription drugs, the death of his father, cousin and pets were almost more than Roger could take—then his mother passed away.

Roger understands that none of the tragedies he has experienced in his life are unique in themselves and that other people face similar tragedies everyday; however, Roger feels that his situation is somewhat different because of the fact that he had to face one life altering event after another.  Permeating every event that Roger had to face was the horrible and debilitating drug withdrawal he suffered for many years.  All these adversities finally took their toll on Roger.

Roger had always clung to his faith and the spiritualism he had embraced while attending Alcoholics Anonymous.  He believed his faith and reliance in God were essential to his recovery.  Throughout this period, Roger prayed countless times.  He asked God over and over for some relief from the trying times he was suffering.  Roger wanted some peace and serenity as he had asked for daily in both his personal prayers and as part of his recovery process.  Roger spiraled into a despair

that he felt was caused by God himself. He felt his prayers were never answered. These feelings of being abandoned by God and his personal struggles eventually led him to turn from his church, his faith, and his God. Roger vowed never to pray again.

Roger felt powerless to do anything. He felt rejected by God and saw no end to his suffering or the suffering of what remained of his family. It occurred to Roger that if he had a powerful weapon, he could regain some of the strength and stability he felt before everything in his life began falling apart. Roger realized that the power he sought was actually growing right in front of him; the castor plant. Roger had seen these little beans growing in his yard in California from the time he was a small child. He knew the plants could be toxic, but he felt that mere possession of the Ricin produced from these beans would be a harmless outlet for his anger and grief. He also felt that possessing this Ricin would somehow protect him and "shield" him from any more hurt.

It was in 1998 that Roger decided to attempt to produce Ricin on his own. He had done a fair amount of research and felt confident that he could produce it in a way that would not harm anyone else. Once the process was completed and Roger had produced the Ricin from the castor beans, he placed the Ricin into carefully sealed chemical containers and the Ricin never saw the light of day again. There was never a time that it was out of his control or vulnerable to anyone else's handling.

The reason Roger never disposed of the Ricin is easy to explain, but may be hard for others to understand. By this time in his life, Roger had experienced tragedies and adversities that had caused him a great deal of pain. His feeling that he had something of great power provided some satisfaction to him. However, Roger insists, and FBI agents involved in this case agree, that he never had any intention of using the Ricin to harm anyone. Again, Roger has no criminal history and has never harmed anyone before. He had no enemies at this time nor did he have any grudges

against anyone. Any disputes he ever had were all settled peacefully with all the parties involved. He has never threatened to hurt anyone, nor did he ever plan to. As illogical as it seemed, Roger sincerely thought that he could produce the Ricin and somehow use it against God for having refused to answer his prayers. It was as if just having the Ricin, knowing it was there to protect him, was enough for Roger.

Eventually, Roger's anger at God softened and he did manage to find his way back to his faith. Roger returned to the church in 2005. Roger came to understand that the trials he has gone through were only temporary challenges. He strongly believes that the only meaningful solution to his grief and anger is to be found in the church. It is there that he believes he can find true serenity and peace until he is reunited with his family when he leaves this earth.

Roger is also before the court facing sentencing on one count of Possession of a Silencer. Roger was not driven by feelings of despair and hopelessness when he decided to craft a silencer. Quite the contrary, in fact. Roger is a devoted animal lover who would never hunt any living thing; however, he takes great pleasure in target shooting. Growing up, Roger had been exposed to guns, but he had never been exposed to target shooting with a silencer. Roger participated in a demonstration in approximately 2001 where he was allowed to shoot targets using weapons with silencers attached. Roger had a great time and found this to be a very enjoyable activity he wanted to pursue as a hobby. Meanwhile, Roger was also honing his skills as a craftsman. He had a shop where he kept all the tools necessary for both his professional projects and his personal hobbies. He had spray painting equipment; wood working tools and metal and machining tools. Roger was always known for his supreme craftsmanship and the pride he took in everything he created. He knows that he should have gone through legal channels to obtain a silencer; however, he thought that he would enjoy shaping a silencer with his own hands. He thought he could create a better, more

intricate silencer on his own. While Roger did spend some time crafting the silencers, he eventually spent no more time on them than he did on any other project he had undertaken.

Roger accepts the fact that possession of Ricin coupled with possession of silencers makes a very evil looking group of weapons. He knows it was wrong to possess these weapons and acknowledges that he must spend time in prison for these mistakes. However, he never had any intention of using either one to hurt anyone. Roger had been in possession of the Ricin for many years. He was always careful to ensure that it was stored in such a way that it would not be able to harm anyone. Roger, himself, believes that only an evil person would use this type of weapon and that he is not an evil person. He could not have used either the Ricin or the silencers because of his fear of facing God's judgement. He would not do anything that would jeopardize his belief that he will eventually be reunited with his loved ones again.

Roger and his three brothers were the only remaining family members once their mother died. A few years after having to bury both parents, the brothers were faced with yet another devastating diagnosis when Fred, the oldest brother, was diagnosed with a neurologic disorder, possibly Lou Gehrig's Disease. Roger and Fred were very close as children. Fred and Roger spoke nearly every day and Roger thought of his brother Fred as his best friend. Roger and his brothers faced another family tragedy. All the brothers maintained their close ties up to the time of Fred's death in January 2008 when he was only 63. Fred's death hit Roger hard.

It was only one week later that Roger found himself in a coma in Spring Valley Hospital. Upon release from the hospital, Roger was taken directly to the North Las Vegas Detention Center. He was never able to make any arrangements for his possessions or the pets he was so lovingly raising at the time he fell ill. Roger lost his loyal and faithful companion of almost 14 years, his German Shepard, who died while Roger was hospitalized. Also during that time, he lost two cats

who were also precious friends to him. The cats were seized by Animal Control also while he was hospitalized. While he was in a coma, all of Roger's personal belongings were either seized by law enforcement and/or taken out of the motel room by his cousin Tom Tholen. Regardless of who took what property, the result is the same; Roger has lost everything.

When Roger looks back on his life, he sees a boy who suffered a burst appendix at 13, a young man who was in a coma at the age of 18, a man who has overcome prescription drug and alcohol addiction; a man who had a heart attack at 47 and a man who was in a second coma at the age of 57. He also sees a man who has lost both his parents, his brother, a cousin and several cherished family pets.

He knows he will face some formidable challenges in the future, but has vowed to rise from the ashes again. Roger is determined to use whatever time he has left in a positive way. Given that his father and brother, Fred, both died of neurological illnesses, Roger worries for himself and his brother, Eric. He worries that either one or both of them might suffer from the same tragic illness and subsequent death as their brother and father did. Roger loves Eric very much and realizes that they are the only remaining members of their immediate family. Roger feels that whatever time he has left he wants to spend building and maintaining a relationship with his brother, Eric.

Although Roger has made some serious mistakes, he is not an evil person and had no desire to cause harm to anyone. Roger's actions in this case were foolish, but he has learned from his mistakes and accepts that he must be punished. A sentence at the low-end of the advisory guideline range, 37 months, is the "sufficient, but not greater than necessary sentence" that complies with the sentencing mandates of 18 U.S.C. § 3553, and it is the sentence that Roger respectfully requests this Court impose.

**B.     Objections to the Presentence Investigation Report**

**1.      Mr. Bergendorff objects to the imposition of a $7,500 fine**

The Department of Probation has recommended a fine in the amount of $7,500. As justification for the fine, the Department of Probation notes that Mr. Bergendorff is a skilled artist and does have the ability to earn a decent wage upon his release from prison. PSR at ¶ 91. Although Mr. Bergendorff is a gifted artist, his ability to pay a fine upon his release will be severely limited by his poor health, his extreme debt, and the difficulties he will face trying to find employment upon his release due to his notoriety in this case. Mr. Bergendorff's credit report currently shows four accounts in collections with outstanding balances totaling $10,763. This amount is likely to increase astronomically as Mr. Bergendorff spent nearly two months in the hospital, much of that time in a coma, prior to pleading guilty in this case.

**2.      Mr. Bergendorff objects to Special Conditions of Supervision #4 and #5**

Special Conditions #4 (Debt Obligations) and #5 (Access to Financial Information) are not reasonably related to Mr. Bergendorff's current offenses. These conditions can only be justified if a fine is imposed in Mr. Bergendorff's case in order to aid in the collection of the fine. As Mr. Bergendorff will have no ability to pay a fine upon his release from incarceration, Special Conditions #4 and #5 are unnecessary and should not be imposed.

///

///

///

///

///

13

## **CONCLUSION**

Based on the above and forgoing, Mr. Bergendorff requests that this Court sentence him to the low-end of the advisory guideline range, 37 months. A sentence at the low-end is an appropriate sentence in this matter and complies with the statutory directives set forth in 18 U.S.C. § 3553(a).

           Respectfully submitted,
           FRANNY A. FORSMAN
           Federal Public Defender


By: /s/Paul Riddle
    PAUL D. RIDDLE
    Assistant Federal Public Defender

## CERTIFICATE OF ELECTRONIC SERVICE

The undersigned hereby certifies that I am an employee of the Law offices of the Federal Public Defender for the District of Nevada and am a person of such age and discretion as to be competent to serve papers.

That on November 5, 2008, I served an electronic copy of the above and foregoing **DEFENDANT'S SENTENCING MEMORANDUM** by electronic service (ECF) to the person named below:

GREGORY A. BROWER
United States Attorney

J. GREGORY DAMM
Assistant United States Attorney
333 Las Vegas Blvd. So., 5th Floor
Las Vegas, Nevada 89101

/S/ Nancy Vasquez
Nancy Vasquez Legal Secretary to
Paul D. Riddle,
Assistant Federal Public Defender